2019 IL App (2d) 180601-U
No. 2-18-0601
Order filed October 22, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| J. LAURENCE KIENLEN, P.C., | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-AR-447 |
| | ) | |
| JOHN GOLEGOS, MICHELE GOLEGOS, | ) | |
| and GOLREN ENTERPRISES, INC., | ) | Honorable |
| | ) | Robert W. Rohm, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Justices Zenoff and Jorgenson concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The manifest weight of the evidence supports the trial court's judgment in all respects except its findings that Kienlen performed estate planning services in violation of the Fraudulent Transfer Act (Act) and that the parties had no agreement for estate planning services. The trial court did not abuse its discretion by not including costs of deposition transcripts in the judgment. Affirm in part, reverse in part, and remand with directions.

¶ 2    Plaintiff, J. Laurence Kienlen, P.C., sued its former clients, defendants, John and Michele Golegos, and Golren Enterprises, Inc., for the recovery of attorney fees billed by plaintiff from two invoices dated October 14, 2016, and October 26, 2016.   The trial court ruled that none of the fees were owed from the October 26 invoice, as there was no agreement between the parties.   As to the

October 14 invoice, the court reduced the balance amount of $33,673 by adopting defendants' summary of objections, and it granted judgment in favor of plaintiff in the amount of $18,419. Plaintiff appeals the trial court's judgment concerning the amount of attorney fees owed to it by defendants.   We affirm in part, reverse in part, and remand the cause with directions.

¶ 3                                I. FACTS

¶ 4     Plaintiff filed a four-count complaint.   Count I alleges breach of contract against defendants for attorney fees and expenses of $33,673, and count III alleges breach of contract against Michele for attorney fees and expenses of $3862.   Counts II and IV alleged account stated, but plaintiff's appeal rests only on the breach of contract counts.

¶ 5     All 12 of plaintiff's exhibits, including plaintiff's two invoices were entered into evidence by agreement of the parties.   The court heard the following evidence at trial.

¶ 6                       A. October 14, 2016, Invoice

¶ 7     John and Michele are the shareholders of Golren, which operates the Corfu Restaurant in St. Charles, Illinois.   George Alimisis was a shareholder.   Defendants and George (who is no longer involved in the matter as he was later discharged in bankruptcy) were sued in federal court by some of their former employees in 2012 (the Maldonado lawsuit).   The Maldonado suit alleged various violations of the Illinois Minimum Wage Law and the Federal Fair Labor Standards Act.   Defendants were represented by George Bellas and William Boznos of the law firm of Bellas & Wachowski (B & W).   The plaintiffs in the Maldonado suit were represented by attorney John Ireland.

¶ 8     On November 4, 2014, Michele contacted Kienlen, stating that she and defendants terminated B & W because the firm had entered into a settlement agreement that she and the other defendants had not authorized.   They wanted to retain the services of plaintiff to vacate

the settlement that they had not authorized. The matter had been settled in the amount of $66,000 for the federal plaintiffs, but the issue of Ireland's fees had been continued for further determination. It was subsequently determined that he was requesting fees of $276,000.

¶ 9    During his initial conversation with Michele, Kienlen reviewed the federal court's docket via the internet, advised Michele that almost 200 documents had been filed in the case, discussed that Ireland had obtained leave of court to file a motion to enforce the settlement agreement, and discussed that Kienlen would bring in additional legal representation of James H. Wolf (JHW) and James M. Wolf (JMW), and discussed that the attorneys' hourly rates were $300, which would begin immediately. According to Kienlen's testimony, Michele agreed to everything discussed during the conversation.

¶ 10    A meeting was scheduled for November 6, 2014, which was attended by Kienlen, JMW, Michele, and John. They talked about the Maldonado suit and the anticipated course of action, including the substitution of Kienlen, JHW, and JMW for B & W. They also talked about the fact that B & W had billed defendants about $84,000 to represent them, that another invoice was pending for fees in the additional amount of $86,317, and that they feared Ireland would be claiming fees far in excess of the fees billed by B & W.

¶ 11    On November 7, 2014, John, Michele, Golren, and George executed an engagement letter, retaining plaintiff's legal services, as well as the legal services of JHW and JMW. The letter stated in relevant part:

> "We have agreed that we will be representing you in all matters pertaining to your disputes with attorneys George S. Bellas, William P. Boznos and/or their firm, [B & W] with regard to their representation of you concerning the [Maldonado] 'lawsuit' filed ***

against you in the United State District Court for the Northern District of Illinois, *** as well as representing you, going forward, in all matters pertaining to said lawsuit.

As you know from our initial conversations, I will be working with lawyers from a law firm located in Chicago, Wolf & Tennant. The lawyers are [JMW], whom you met yesterday, and his father, [JHW]. We will charge you for our fees on an hourly basis by the actual time expended by us. Our current rates are $300.00 per hour. In any event, we will endeavor to provide you with cost effective representation.

***

We will send you periodic statements for services rendered and you agree to pay the amount due immediately upon receipt. If you have any questions about a statement, please call them to our attention promptly, but in no event no later than 30 days after you receive the statement. Your statement will reflect day, task, and time of attorney."

¶ 12   On December 12, 2014, defendants executed a written settlement authorization to settle the Maldonado suit for $132,000.

¶ 13   The October 14, 2016, invoice submitted into evidence stated that from November 4, 2014, to October 13, 2016, plaintiff provided 144.50 hours of legal services and incurred $323 of expenses. After crediting defendants for all money plaintiff had received, the invoice totaled $33,673 for legal services.

¶ 14   As defendants questioned a majority of the charges on plaintiff's October 14 invoice, their counsel cross-examined Kienlen regarding the reasonableness of many of the charges. Counsel questioned Kienlen as to the amount of time it took to review certain documents. Counsel also questioned him regarding whether Kienlen had inflated some of the charges by double billing for

such items as phone calls between Kienlen and JMW or JHW, or whether it was "cost effective" for such things as Kienlen's review of work already prepared by JMW or JHW.

¶ 15    Defense counsel questioned Michele regarding the October 14 invoice.   Michele clarified that she did not understand that she would be paying $900 an hour for all of the attorneys working on the case and that she never saw any one of the bills through the course of two years of working on the matter, and therefore, she was never able to review what work was completed to support the fees.

¶ 16    Another item questioned by defense counsel concerned the purpose for plaintiff's charges for estate planning.   Those charges ranged from August 15, 2016, to October 13, 2016. Kienlen testified that he had a conversation with Michele in which she told him that, "if somebody got a judgment against John," it was possible that they could go after assets.   Kienlen explained that the Maldonado suit had already been settled, but defendants were aware that other employees could file similar lawsuits, although nothing had been filed or was pending yet. Kienlen stated:   "So it was kind of an attempt to protect the assets."   The home was already in a land trust, but Kienlen changed the beneficial interest of the land trust and transferred restaurant property John owned in Elgin into the trust, removed John as the beneficiary, and made Michele the sole beneficiary.

¶ 17                              B. October 26, 2016, Invoice

¶ 18    In July 2016, Kienlen stated that he received an email from Ireland that he had another client, Irene Baykan, another of defendants' former employees, who was prepared to file suit against defendants with charges similar to the Maldonado suit.   Kienlen met with Michele and George and prepared an engagement letter.   Kienlen testified that Michele wanted representation no matter what, regardless of what John wanted.   But John did not want to be represented.

Kienlen explained to Michele that his fees had increased to $350 per hour. He stated that Michele agreed to pay him for legal services rendered with regard to the matter at the rate of $350 per hour. Kienlen drafted an agreement in September, 2016, and presented it to Michele, but she never signed it. Although no agreement was signed, counsel for defendants pointed out that the October 26, 2016, invoice submitted by Kienlen, charged defendants from July 20, 2016, to October 18, 2016, for 16.75 hours of legal services for a total of $3,862.

¶ 19　Michele testified that John wanted to represent himself in the Baykan matter. Michele stated that Kienlen did give her a new engagement letter to sign regarding the Baykan matter, but she did not sign it. She remembered meeting Kienlen in his car, that he wanted her to sign it, but she did not have the money to go forward with the Baykan matter. At that time, she did not know how much she owed on the October 14 bill, she had already paid an "excruciatingly large amount of money" in the other case, and she was not sure what she was going to do, although she knew she wanted representation regarding the Baykan matter. Michele just was not "sure if it was going to be Larry."

¶ 20　John testified, denying that a $2000 check he gave to plaintiff was payment toward the Baykan matter. He stated that he wrote the check at Michele's request to pay for the estate planning that plaintiff had suggested. John also testified that he never had a conversation with Kienlen about the conflict of interest the assignment of the beneficial interest in their house presented to his interest in the property.

¶ 21　Kienlen testified in rebuttal. He stated that he did meet John at Michele's suggestion. Kienlen went to their restaurant and talked about the case, that John reviewed both bills and he had no specific objection to either one. John told Kienlen that he would pay him $2000 a month beginning in June. As far as Michele was concerned, Kienlen testified that she asked him to hold

off on paying the bill because John was so upset about the settlement. Because she was so upset about the settlement amount, Kienlen held off, but he stated that he should have billed her right away. He "was trying to be nice."

¶ 22                                    C. Trial Court's Findings

¶ 23    At the conclusion of the trial, the judge stated:

"I didn't require any pretrial memo or anything like that, but I really don't—it's not really for the Court—absent an expert testifying as to the reasonableness and customary charges for the community in which the services were rendered, it's really not up to me to go through there and impose my—you know, just pick them out of the air because I might find things that are—what I believe are inappropriate that you might be okay with.

So what I'd like you to do is I'd like you to go through both of those bills and tell me why various entries are not reasonable and not customary. Okay?"

¶ 24    Defendants submitted a summary of objections to the trial court, detailing their objections as to why they believed many of the charges were unreasonable and not customary. For the October 14 bill, defendants asked it to be reduced by $15,960 for a total of $17,713. As to the October 26 bill, defendants asked the court to deny the invoice of $3862 and relieve defendants of responsibility for paying it. Plaintiff filed a response to defendants' objections.

¶ 25    Following the submission of the posttrial objections, the trial court made the following findings. The trial court first found that sending one bill (the October 14 invoice) two years later was a breach of contract. The trial court next regarded the complexity of the federal court case. The court understood that the underlying case was potentially complicated. However, the court noted that the issue plaintiff was hired for, based on Kienlen's own testimony, was to

vacate a settlement with which defendants were unhappy. The court further noted that Kienlen had testified that the prior lawyer who had entered into the agreement was prepared to say that he did not have the authority to settle the federal matter. To the trial court, this made it a "very easy procedure. You either—you either get the judge to believe it or you don't. You put on your witness, you put on the attorney, you put on your two clients and they say—your clients say, I didn't give my attorney authority to settle that, and you have the attorney saying, I misunderstood." The court stated further that it appreciated "an attorney being prepared, but, frankly, given that you have the attorney that entered into the agreement a hundred percent on board, which is not always the case, there was no need, no need whatsoever," to do the work that was done on this file. "Certainly no need to bring in three lawyers."

¶ 26 With respect to the trust transaction, the court next appeared to have a problem with plaintiff setting up a trust with the intent to avoid potential judgment creditors, which the court questioned whether it was a violation of the Fraudulent Transfer Act. The court further found that plaintiff "had no agreement to do that."

¶ 27 The court ruled that there was no agreement for the October 26, 2016, bill and that defendants would not be responsible for any of it. The court credited defendants the $2000 payment towards the October 14 bill.

¶ 28 The court then adopted "[e]ach and every suggestion" of defendants, "which means the two of you (Kienlen and defendants' counsel) have to go through that response, go through the bill." The court stated that it had "some questions on some of them," because some of the math was incorrect and some of it the court did not quite understand. So, the judge sent the attorneys out to go through the summary of defendants' suggestions to "figure out how much is owed because I am adopting [defendants'] request." The judge further stated that "if there's a

dispute, I'll make the decision on which—number is accurate." After inviting the attorneys to step out into the anteroom to work it out, the judge stated, "I'll be here all day, so if you can't that's fine." Thereafter, an order entered by the trial court granting judgment in favor of plaintiff in the amount of $18,419.

¶ 29    Plaintiff timely appeals the trial court's decision concerning the amount of attorney fees owed to it by defendants.

¶ 30                              II. ANALYSIS

¶ 31                           A. Standard of Review

¶ 32    Unlike findings in a fee petition case, which rest in the sound discretion of the trial judge, the reasonableness of attorney fees in a common law breach of contract action, like in this case, presents a question to be resolved by the trier of fact, following a fair and impartial trial. *Laff v. Chapman Performance Products, Inc.*, 63 Ill. App. 3d 297, 308 (1978). In civil actions brought by attorney-plaintiffs to recover compensation for professional services performed under an alleged contract, the usual rules governing breach of contract actions apply because "[t]he liability to pay for legal services stands upon the same footing as other agreements." *Wildman, Harrold, Allen and Dixon v. Gaylord*, 317 Ill. App. 3d 590, 597 (2000) (quoting *Sokal v. Mortimer*, 81 Ill. App. 2d 55, 64 (1967)). However, a reviewing court is free to set aside an oppressive verdict for attorney fees as it would "any other verdict which is contrary to the 'manifest weight of the evidence.' " *Slater v. Jacobs.* 56 Ill. App. 3d 636, 643 (1977). In a breach of contract action seeking attorney fees, it is not the province of this court to substitute its judgment for that of a jury unless there is a patent error wherein the weight of the evidence demands a contrary conclusion. *Sokal*, 81 Ill. App. 2d at 64.

¶ 33    Whether a judgment is rendered after a bench trial with the judge sitting as the "trier of fact" as opposed to a jury does not alter this standard of review.    A trial judge's conclusions on factual issues are entitled to the same weight as a jury verdict.    *Johnson v. Abbott Laboratories, Inc.*, 238 Ill. App. 3d 898, 905 (1992).    Additionally, when a judge sits as the trier of fact in a bench trial, the judge is presumed to have considered only competent evidence presented by the parties at trial.    *Buckner v. Causey*, 311 Ill. App. 3d 139, 145 (1999).    A court's consideration of matters outside of the trial record is prejudicial error which can result in a reversal of its judgment.    *Id.*

¶ 34    In determining the reasonableness of attorney fees in a bench trial, the judge does not exercise 'broad discretionary powers."    *Id.* at 142.    A trial judge cannot abuse his discretion by determining that attorney fees are reasonable in a civil trial on the merits because "discretion has nothing to do with the issue."    *Id.*    Thus, as in any other civil breach of contract actions, the sole question on review is whether the trial court's judgment for attorney fees and costs was against the "manifest weight of the evidence."    *Wildman, Harrold*, 317 Ill. App. 3d at 598.

¶ 35    In an action for attorney fees based on a breach of contract theory or *quantum meruit* theory, the plaintiff-attorney's *prima facie* case includes proof of the following: (1) the existence of an attorney-client relationship, (2) the nature of the services rendered, (3) the amount of time expended, and (4) the result, if any, obtained for the client.    *Greenbaum & Browne, Ltd. v. Braun*, 88 Ill. App. 3d 210, 213-14 (1980).    A plaintiff-attorney must also furnish sufficient facts and computations to establish, by a preponderance of the evidence, that the services rendered were necessary and that the amount of fees sought is fair, just, and reasonable.    *Laff*, 63 Ill. App. 3d at 308 (plaintiffs presented sufficient evidence to justify the hours spent and the resulting fee).

¶ 36    In a civil trial, the necessity of legal services performed and the reasonableness of the amount charged are questions of fact.   *Wildman, Harrold*, 317 Ill. App. 3d at 599.   The trial judge, sitting as the trier of fact, decides these issues based on the weight of the competent evidence.   Evidence sufficient to support a civil judgment for attorney fees may be comprised solely of witness testimony.   *Id.*

¶ 37                                B. Manifest Weight of the Evidence

¶ 38    Plaintiff presents several issues regarding whether the trial court's judgment was against the manifest weight of the evidence.   A trial court's judgment is against the manifest weight of the evidence when its findings appear to be unreasonable, arbitrary, or not based on the evidence. *Wildman, Harrold*, 317 Ill. App. 3d at 599.   On appeal, the reviewing court must take questions of testimonial credibility as resolved in favor of the prevailing party and must draw from the evidence all reasonable inferences in support of the judgment.   *Id*.   A reviewing court will not reverse a trial court's decision if different conclusions can be drawn from contradictory testimony unless an opposite conclusion is clearly apparent.   *Id.*

¶ 39    We must give great deference to the trial court's findings because the trial court, as the trier of fact, is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive.   *Buckner v. Causey*, 311 Ill. App. 3d 139, 144 (1999).   Where the determination of the case depends largely upon the facts found in the record, the findings and judgment of the trial court "will not be disturbed by the reviewing court, if there is *any* evidence in the record to support such findings."   (Emphasis added.)   *Wildman, Harrold,* 317 Ill. App. 3d at 599 (quoting *Schioniger v. Cook County*, 116 Ill. App. 3d 895, 899 (1983)).   In order to warrant reversal, "the appellant must present evidence that is so strong and convincing as to overcome,

completely, the evidence and presumptions, if any, existing in the appellee's favor." *Raclaw v. Fay, Conmy & Co.*, 282 Ill. App. 3d 764, 767 (1996). Moreover, this court may affirm the judgment upon any ground warranted, regardless of whether it was relied on by the trial court and regardless of whether the reasons given by the trial court are correct. *Cronin v. McCarthy*, 264 Ill. App. 3d 514, 523 (1994). Using these standards as our guide, we address plaintiff's manifest weight of the evidence arguments on appeal.

¶ 40        1. Trial Court's Finding that Plaintiff was Hired to Perform an Easy Legal Matter

¶ 41        Plaintiff first contends that the trial court's finding that it was hired to accomplish a straight-forward and easy legal matter without the need of three lawyers was against the manifest weight of the evidence. Kienlen testified that "first and foremost" his firm was hired by defendants to negate the settlement agreement that defendants' previous attorney, Bellas, had entered into on their behalf. Kienlen also acknowledged that "Bellas turned out to be a very helpful witness." While the judge recognized that such a task was "potentially complicated," it found that plaintiff's services were made easier by the co-operation of defendants' former attorney. With the co-operation of defendants' former attorney, plaintiff did not necessarily need to engage in additional work to enforce the settlement. Even though the trial court overstated the evidence when it said that Bellas was prepared to say that he exceeded his authority, Kienlen nevertheless did testify that Bellas was a co-operative witness.

¶ 42        The trial court took issue with the need to have multiple attorneys involved in this straight-forward case. Most of the reductions from the invoice related to the additional attorneys working on the case. These findings do not appear to be against the manifest weight of the evidence based on how the motion to enforce the settlement agreement played out in the

federal case. Accordingly, there is evidence to support the trial court's finding that plaintiff was hired to accomplish a straight-forward legal matter without the need of three lawyers.

¶ 43                    2. Trial Court's Finding Precluding Fees for Estate Planning

¶ 44    Plaintiff next contends the trial court's ruling that the Act precluded attorney fees for the estate planning services rendered by plaintiff was against the manifest weight of the evidence. Plaintiff argues that the trial court made unreasonable and arbitrary conclusions from Kienlen's testimony. The court found that the estate planning services by plaintiff included setting up a trust with the intent to avoid judgment creditors or avoid potential exposure in violation of the Act. The court then ruled that plaintiff had no agreement to do that.

¶ 45    Kienlen testified that it was John's idea to transfer assets into Michele's name. John and Michele's home was already in a land trust. They also owned another restaurant in Elgin as joint tenants. The estate planning services performed by plaintiff included transferring title to the Elgin restaurant by quit claim deed to the same trust which already held title to the couple's marital home and changing the beneficial interest in the land trust from John and Michele as joint tenants to Michele. At the time the estate planning work was performed, the Maldonado suit had been dismissed.

¶ 46    On cross-examination, Kienlen testified that in discussing the transfers with Michele, he advised her that "if somebody got a judgment against John, it's possible that they could go after the assets saying that the transfer was somehow to defraud their creditors." When asked further if the transfers were an attempt to protect the assets, Kienlen stated, "Yeah, put their assets one step removed from them able to get it if they got a lawsuit judgment against John." No evidence was introduced about John or Michele's other assets, or Kienlen's knowledge of their other assets, except for John's sole ownership of Golren.

¶ 47      The intent of the Act is to provide a creditor with a cause of action to make the transfer voidable where a transfer made by a debtor is fraudulent as to the creditor.   As pointed out by plaintiff, the basis of any suit to set aside a fraudulent transfer is the debtor's voluntary depletion of his own net worth to a point at which he cannot fully repay the claims of creditors.   A requirement of the Act is that the debtor was either insolvent at the time of the transfer or became insolvent as the result of the transfer.   See 740 ILCS 160/6(a) (West 2018).   Here, there is nothing in the record of the solvency or insolvency of John.   No evidence was introduced that as the result of the transfer and change in the trust's beneficial interest that John was either insolvent at the time of the transfer or became insolvent as the result of the transfer as required by the Act.

¶ 48      Furthermore, no evidence was introduced which would have permitted the trial court to conclude that Kienlen placed John in a position whereby his assets could not be reached by creditors.   In fact, the issues raised by the Act simply were not raised by either party during the trial and the trial court's finding was against the manifest weight of the evidence.

¶ 49      Additionally, aside from the trial court's erroneous ruling regarding the Act, here, the record clearly indicates that the parties entered into a verbal agreement for plaintiff to perform the estate planning services for John and Michele.   Kienlen testified that it was John's idea to transfer the assets into Michele's name.   He stated that John's and Michele's home was already in a land trust, but he changed the beneficial interest of the trust and transferred the Elgin property into the trust.   Kienlen, for the most part, communicated about the real estate planning with Michele, and then he met them to execute the documents.   Michele testified that she signed the trust documents.   This is also evidenced by John's and Michele's signatures on the exhibits, which were entered into evidence.   Accordingly, the trial court's judgment concerning

plaintiff's estate planning fees was against the manifest weight of the evidence as its findings appear to not be based on the evidence.

¶ 50      3. The Trial Court's Finding Denying Plaintiff's Fee for the October 26 Invoice

¶ 51      Plaintiff next contends the trial court's finding that there was no agreement with Michele for legal services rendered with regard to the Baykan matter as set forth in the October 26 invoice was against the manifest weight of the evidence.   At trial, Kienlen testified that he had a verbal agreement with Michele to retain his firm to defend her against the lawsuit filed by Baykan.   Michele testified at trial to the contrary.   She also testified that, although she received an engagement agreement from plaintiff, she never signed it.   No signed engagement agreement was produced or entered into evidence.   The trial court ruled that none of the fees from the October 26, 2016, invoice was owed as there was no agreement for it.

¶ 52      In Michele's discovery deposition, which was introduced into evidence by agreement of the parties, Michele admitted that she contacted plaintiff and requested that it represent her with regard to the lawsuit being contemplated by Baykan.   Although Michele told Kienlen that she was thinking about hiring his firm to represent her, she testified at trial that she told him that she did not think she could go forward with this.   As stated, we will not reverse a trial court's decision if different conclusions can be drawn from contradictory testimony unless an opposite conclusion is clearly apparent.   *Wildman, Harrold*, 317 Ill. App. 3d at 599.   The determination here depends upon the facts found in the record and the judgment will not be disturbed if there is any evidence in the record to support such findings.   *Id.*   Since there is evidence in the record to support the court's ruling that there was no agreement, we cannot say that it is against the manifest weight of the evidence.

¶ 53    Plaintiff points out Kienlen's trial testimony that there was an agreement regarding the Baykan matter was corroborated by Michele's discovery admission, as well as by numerous telephone and in-person conferences held between Kienlen and Michele.   However, plaintiff never used Michele's discovery deposition as impeachment at trial.

¶ 54    4. The Trial Court's Ruling Allowing Defendants' Posttrial Objections to Plaintiff's Invoices

¶ 55    We next turn to the trial court's ruling allowing all of defendants' posttrial objections to plaintiff's invoices.   Because we determined that the manifest weight of the evidence supported the trial court's finding that defendants did not owe any of the fees from the October 26, 2016, invoice, we need only focus on the October 14 invoice.

¶ 56    During the trial, defendants' attorney submitted a summary of objections to the October 14 invoice.   Plaintiff submitted a response to the objections.   The trial court adopted "each and every suggestion set forth by the defendants."   The court had questions on some of the suggestions regarding the calculation so it asked the attorneys to go through the summary of objections to figure out the total owed to plaintiff.

¶ 57    Plaintiff now complains that no hearing was conducted in which evidence was introduced regarding the summary.   He also argues that he was not given the opportunity to introduce evidence or to cross-examine defendants' counsel concerning the objections.   Plaintiff's argument misses the point.   Plaintiff had the burden at trial to supply sufficient facts and computations to establish, by a preponderance of the evidence, that the services rendered were necessary and that the amount of fees sought was fair, just, and reasonable.   See *Laff*, 63 Ill. App. 3d at 308.

¶ 58    Regardless, the question remains whether there is "any" evidence in the record to support the trial judge's determination that $18,419 was the amount owed to plaintiff pursuant to its contract for legal representation of defendants.   Where an attorney and client enter into an express contract for representation, the terms of the express contract control the compensation due the attorney.   *Wildman, Harrold*, 317 Ill. App. 3d at 601.   "Clearly, when an express contract exists, a resort to *quantum meruit* principles is unnecessary because the attorney and client have already agreed on the value of the services."   *Laff*, 63 Ill. App. 3d at 310. Nonetheless, compensation due an attorney pursuant to an express contract must still satisfy certain professional standards applicable to attorneys.   *See Nottage v. Jeka*, 172 Ill. 2d 386, 397 (1996).   Rule 1.5(a) of the Illinois Rules of Professional Conduct requires that all fees for legal services be reasonable.   Ill. S. Ct. Code of Prof. Res., R. 1.5(a) (eff. Jan.1, 2010).

¶ 59    The trial court based its determination on defendants' objections, which detailed what defendants believed was unacceptable in plaintiff's statement and their suggestions as to what they believed was more reasonable times and charges.   Plaintiff disputed these objections also giving its explanations of the billings and its context and never requested the opportunity to present further evidence concerning the objections.   The trial court reviewed these objections and responses and used them as a form of closing argument, which commented on the trial evidence, and the court made a determination as to what was reasonable.   The trial court's conclusion regarding the amount of time expended and the necessity and reasonableness of the legal services rendered are factual determinations.   *Laff*, 63 Ill. App. 3d at 308.   It is the function of the trier of fact to weigh contradictory evidence, the credibility of the witnesses, and draw ultimate conclusions as to the facts of a case.   *Wildman, Harold*, 317 Ill. App. 3d at 606. We find that there is evidence to support the trial court's determination, except regarding

plaintiff's fee for the estate planning services. Accordingly, we vacate the award and remand for a recalculation to include compensation for the estate planning fees. On remand, the trial court should make a determination as to the reasonableness of those fees.

¶ 60                                    C. Costs

¶ 61    As a final matter, plaintiff argues that its costs should have included Michele's discovery deposition transcripts. At first, the trial court stated that the deposition was not admitted at trial. However, as plaintiff points out, it was admitted by stipulation as Exhibit 5. The court then stated that simply admitting it was not enough.

¶ 62    Costs are allowances of incidental damages awarded by law to reimburse the prevailing party to some extent at least for expenses necessarily incurred in the assertion of his or her rights in court. Therefore, Supreme Court Rule 208(d) (eff. Jan. 1, 2018) is interpreted as authorizing a court to tax as costs, in its discretion, the expenses only of those depositions necessarily used at trial. *Galowich v. Beech Aircraft Corporation*, 92 Ill. 2d 157, 165-66 (1982).

¶ 63    Here, the record shows that plaintiff never impeached Michele with the discovery transcript and plaintiff never argued it as an admission. We therefore cannot say that the trial court abused its discretion by not including this in the judgment as plaintiff's costs.

¶ 64                                III. CONCLUSION

¶ 65    For the reasons stated, we reverse the judgment of the circuit court of Du Page County insofar as its findings regarding the estate planning services were against the manifest weight of the evidence, and remand the cause for the court to recalculate the award to include compensation for the estate planning matter. We affirm the circuit court's judgment in all other respects.

¶ 66    Affirmed in part and reversed in part; cause remanded with directions.